IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34926-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. ZACK, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Donald Zack appeals his conviction for third degree assault of a law enforcement officer, contending that the State of Washington did not retain jurisdiction to prosecute an Indian for any offenses committed within the boundaries of the Yakama Reservation. Interpreting the governor's retrocession proclamation as he intended it, we conclude that the State retained jurisdiction to prosecute Mr. Zack for an offense occurring on deeded land and affirm the conviction.

FACTS

The salient facts are largely historic and will be discussed shortly. As to the facts of this incident, few are relevant to the analysis. Mr. Zack, who lives on the Yakama Reservation but is not an enrolled member of the tribe, was booked into the Toppenish City Jail. A jail officer then took him to the Toppenish City Hospital, property located on

deeded (fee) land within the boundaries of the reservation, for treatment. While at the hospital, Mr. Zack assaulted the officer. The officer is not an Indian; Mr. Zack asserts that he is an Indian, although he is not an enrolled member of any tribe.

In general terms, Washington responded to Public Law 280 by asserting civil and criminal jurisdiction over Indians acting on deeded or fee lands, but it declined to assert jurisdiction over Indians while on tribal or trust land.[1] RCW 37.12.010. The history of Washington's assertion of jurisdiction over the Yakama Reservation is discussed in *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 465-76, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979).[2] Subsequently, Congress acted to encourage states to withdraw some of their assertions of authority in favor of tribal authority. 25 U.S.C. §1323 (1968).

Washington responded by passing legislation authorizing the Governor, upon the request of a tribe, to enter into negotiations with any tribe desiring to assume jurisdiction from Washington State. RCW 37.12.160. Governor Jay Inslee, after negotiations with the Yakama Nation, issued Proclamation 14-01 on January 17, 2014.[3] The proclamation returned complete civil and criminal jurisdiction to the tribe in four specific subject areas,

---

[1] *See, e.g.*, *State v. Sohappy*, 110 Wn.2d 907, 757 P.2d 509 (1988) (no State jurisdiction over Indian acting on tribal lands or in-lieu sites). Nothing in the Governor's proclamation affects Indians acting on tribal lands. *Sohappy* remains good law.

[2] *Yakima Indian Nation* recognized that Washington had assumed criminal jurisdiction over fee lands to the full extent permitted by Public Law 280. 439 U.S. at 498.

[3] A copy of the proclamation is attached as Appendix A.

returned some civil and criminal jurisdiction arising from the operation of motor vehicles

on public thoroughfares, and noted some subject areas in which no changes were being

made. With respect to the question of criminal jurisdiction, the proclamation states in

paragraph 3:

> 3. Within the exterior boundaries of the Yakama Reservation, the State shall retrocede, in part, criminal jurisdiction over all offenses not addressed by Paragraphs 1 and 2. The State retains jurisdiction over criminal offenses involving non-Indian defendants and non-Indian victims.

(emphasis added). *See* Appendix A at 2.

In his formal conveyance of the proclamation to the Assistant Secretary of Indian

Affairs, Governor Inslee wrote a clarification to assure that the underscored language was

understood to mean that the State was retaining jurisdiction in criminal cases where either

the defendant or the victim was not an Indian. *See* Appendix B at 2. In accepting the

State's retrocession of jurisdiction, the Department of Interior accepted only the

proclamation and not the interpretation placed on it by the Governor. *See* Appendix C at

5. In the view of the Assistant Secretary, the proclamation was unambiguous and did not

need interpretation, but that the courts would resolve the matter if needed. *Id.*

The State filed a charge of third degree assault. Mr. Zack moved to dismiss the

prosecution for lack of jurisdiction, alleging that he was an Indian and that under the

terms of the proclamation, the State could not act against him because it had retained

jurisdiction only of criminal matters that involved both a non-Indian defendant and a non-

3

Indian victim. Evidence of Mr. Zack's Indian heritage was presented and argued to the

trial court, but the judge made no determination of that status.[4]

Instead, the court interpreted the proclamation to mean that the State retained

jurisdiction if either the defendant or the victim was a non-Indian. The motion to dismiss

was denied. Mr. Zack then stipulated to admission of the police reports and was

convicted as charged at a bench trial. He timely appealed to this court.

## ANALYSIS

This appeal presents two issues. In the published portion of this opinion, we

address the interpretation of the retrocession proclamation. In the unpublished portion,

we address Mr. Zack's contention that the evidence was insufficient to support the

conviction.

*Retrocession Proclamation*

The jurisdiction issue turns on the meaning of the Governor's proclamation, with

the dispositive question being the meaning of the word "and." In context, the word "and"

---

[4] Mr. Zack testified that he is 15/32 Indian (7/32 Yakama, 1/4 Muscogee Creek) and is ineligible to enroll as a member of the Yakama Nation; he claims eligibility to enroll with the Muscogee Creek Tribe in Oklahoma, but has not done so. Mr. Zack has received medical and dental benefits through the federal Indian Health Services for his entire life, participates in treaty fishing with the tribe, and has held jobs at the tribal casino. Mr. Zack also testified that he has spent some time in the tribal jail, but is no longer allowed there and instead is held by Yakima County. The State alleged in its trial court briefing that in 2014 the tribe turned Mr. Zack over to the State for prosecution of a trespass case that occurred on tribal trust land.

is used in a list and should be read in the disjunctive; to do otherwise would render the proclamation internally inconsistent and nonsensical. Thus, we agree with the Governor that the meaning of the word "and" in this instance is "and/or."

Whether a state court has jurisdiction over crimes committed on reservation land is a question of law subject to de novo review. *State v. Squally*, 132 Wn.2d 333, 340, 937 P.2d 1069 (1997). We have been unable to find clear Washington authority addressing construction of a gubernatorial proclamation.[5] Since this particular proclamation, like many before it, flows from a statutory grant of authority to enter into negotiations upon the request of a tribe and to return jurisdiction to the tribe when agreeable, we deem it appropriate to treat the proclamation as if it were legislative in origin.[6]

When addressing a question of pure statutory interpretation or of the meaning of the constitution, an appellate court also engages in de novo review. *State v. Bradshaw*, 152 Wn.2d 528, 531, 98 P.3d 1190 (2004).[7] The goal of statutory interpretation "is to discern and implement" legislative intent. *Lowy v. PeaceHealth*, 174 Wn.2d 769, 779,

---

[5] In *Squally*, the court's opinion makes reference to the "broad language" of the Governor's proclamation, a factor of significance to the court's resolution of the jurisdictional issue presented by that case. *Squally*, 132 Wn.2d at 343. However, the court never stated a standard of review applicable to the proclamation nor did it suggest whether the Governor's language was accorded any special weight in the court's analysis.

[6] Due to the absence of case or statutory authority on the topic, the attorney general issued an opinion indicating it was appropriate to interpret a gubernatorial proclamation in the same manner as construing a statute. 1957 Op. Att'y Gen. No. 74, at 3.

[7] The same standard applies to review of administrative regulations. *Skinner v. Civil Serv. Comm'n*, 168 Wn.2d 845, 849, 232 P.3d 558 (2010).

280 P.3d 1078 (2012). In some circumstances, "legislative intent" may also include the Governor's intent: "Where the Governor has vetoed part of a statute, the Governor has acted as part of the Legislature and we consider gubernatorial intent as well." *In re Marriage of Maples*, 78 Wn. App. 696, 701-02, 899 P.2d 1 (1995) (citing *State ex rel. Royal v. Yakima County Comm'rs*, 123 Wn.2d 451, 462-63, 869 P.2d 56 (1994)). *Accord State v. Reis*, 183 Wn.2d 197, 212-13, 351 P.3d 127 (2015); *Hallin v. Trent*, 94 Wn.2d 671, 677, 619 P.2d 357 (1980); *Shelton Hotel Co. v. Bates*, 4 Wn.2d 498, 506, 104 P.2d 478 (1940). In the circumstance of a gubernatorial proclamation that carries out a legislative grant of authority, we likewise consider it appropriate to treat the Governor's express statement of intent as a species of "legislative intent" for the purpose of construing the Governor's meaning.[8]

A court begins its inquiry into determination of intent by looking at the plain meaning of the statute as expressed through the words themselves. *Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 317, 190 P.3d 28 (2008). If the statute's

---

[8] We note that the federal courts look to presidential intent when construing the meaning of a proclamation. *E.g.*, *Diaz v. United States*, 222 U.S. 574, 578, 32 S. Ct. 184, 56 L. Ed. 321 (1912) ("It could not have been the intention of the President to prevent the seizure of property when necessary for military uses, or to prevent its confiscation or destruction."); *Bailey v. Richardson*, 182 F.2d 46, 52 (D.C. Cir. 1950) ("The question is not what the word might mean otherwise or elsewhere; the question is simply what the President used it to mean."), *aff'd by an equally divided court*, *Carlson v. Landon*, 341 U.S. 918, 71 S. Ct. 669, 95 L. Ed. 1352 (1951), *abrogated by Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571 & n.9, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).

meaning is plain on its face, the court applies the plain meaning. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).[9] A provision is ambiguous if it is reasonably subject to multiple interpretations. *State v. Engel*, 166 Wn.2d 572, 579, 210 P.3d 1007 (2009). Only if the language is ambiguous does the court look to aids of construction, such as legislative history. *Armendariz*, at 110-11. When interpretation is necessary, the legislation "must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous." *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996).

Initially, we do conclude that the challenged language of paragraph three is potentially ambiguous. Although the word "and" typically is used in the conjunctive sense of joining two or more items, it need not be so applied:

> Where the plain language and intent of the statute so indicate, "[t]he disjunctive 'or' and conjunctive 'and' may be interpreted as substitutes." *Mount Spokane Skiing Corp. v. Spokane County*, 86 Wn. App. 165, 174, 936 P.2d 1148 (1997); *see also CLEAN v. City of Spokane*, 133 Wn.2d 455, 473-74, 947 P.2d 1169 (1997); *Bullseye Distrib. LLC v. State Gambling Comm'n*, 127 Wn. App. 231, 238-40, 110 P.3d 1162 (2005).

*State v. McDonald*, 183 Wn. App. 272, 278, 333 P.3d 451 (2014). This long has been a rule of construction. *State v. Tiffany*, 44 Wash. 602, 604, 87 P. 932 (1906) ("No doubt *or* is sometimes construed to mean *and*, and *vice versa*, in statutes, wills, and contracts.").

---

[9] Similarly, words in a constitutional provision are given their common and ordinary meaning. *State ex rel. Albright v. City of Spokane*, 64 Wn.2d 767, 770, 394 P.2d 231 (1964).

There simply are times where the meaning of the word "and" is unclear and Mr. Zack's argument convinces us this is one of those occasions.[10]

Here, it is appropriate to treat "and" as "or" in order to avoid rendering a portion of the proclamation meaningless. After noting the return of jurisdiction in paragraphs one and two, the proclamation states that all other matters of criminal jurisdiction are returned "in part," but that the State was retaining "criminal offenses involving non-Indian defendants and non-Indian victims." Appendix A at 2. Mr. Zack's construction of that phraseology would mean that the only type of case the State now could prosecute would require the involvement of non-Indian defendants who victimized other non-Indians on fee land. However, Public Law 280 and RCW 37.12.010 were only about the assertion of State jurisdiction over Indians. The State already had authority to prosecute non-Indians for offenses committed on deeded lands prior to the enactment of Public Law 280. *E.g.,* *Draper v. United States*, 164 U.S. 240, 17 S. Ct. 107, 41 L. Ed. 419 (1896) (only state had authority to try non-Indian for murder of non-Indian); *State v. Lindsey*, 133 Wash. 140, 144-45, 233 P. 327 (1925) (non-Indian manufacturer of liquor); *State v. Batten*, 17 Wn. App. 428, 430, 563 P.2d 1287 (1977) (murder of non-Indian by non-Indian). Excluding Indians from prosecution in all cases, as Mr. Zack contends occurred in this proclamation,

---

[10] Indeed, in *Yakima Indian Nation*, the Supreme Court rejected an argument that the phrase "assumption of civil *and* criminal jurisdiction" in Public Law 280 had to be read conjunctively. 439 U.S. at 496-97.

8

would mean that the Governor intended to return *all* of the criminal jurisdiction the State assumed by RCW 37.12.010 and the words "in part" would be rendered meaningless because there would have been total rather than partial retrocession.[11]

In addition, the proclamation also would be rendered nonsensical and in excess of the Governor's statutory authority. Read literally, as Mr. Zack argues we must do, the proclamation would only apply to multiple defendants committing offenses against multiple victims. Apparently a single defendant acting on his own could not be prosecuted for offending against either a single victim or against multiple victims. In addition, even multiple defendants presumably could not be prosecuted if they acted in concert against only a single victim. Finally, victimless crimes could not be prosecuted at all if the only jurisdiction the State was retaining involved multiple defendants acting against multiple victims. This interpretation is nonsensical.

The Governor also was not authorized by RCW 37.12.160 to return any jurisdiction other than that assumed by RCW 37.12.010. Asserting or removing State jurisdiction over non-Indians is not within the scope of Public Law 280 or RCW

---

[11] Examples of the kinds of cases the State was returning would include most drug and hunting offenses committed on fee lands (along with all other victimless crimes), as well as crimes committed by an Indian against an Indian on fee land. Since the State had no jurisdiction over Indians acting on tribal land, those situations are not changed by the proclamation.

37.12.010. Interpreting the proclamation as Mr. Zack insists would result in the Governor engaging in an *ultra vires* action.

For all of these reasons, we reject Mr. Zack's contention. Standard rules of construction simply preclude his interpretation of the proclamation. In addition, we also have the Governor's clarification of his intent contained in the letter in Appendix B. Although we think the Governor's interpretation is strong evidence of his intent, it is not controlling over our decision any more than a legislative statement of intent controls an issue of statutory construction. Nonetheless, it is significant contemporaneous evidence of the purpose behind the Governor's choice of language. It fully supports our decision.

Thus, we conclude that the State retained jurisdiction to prosecute this assault against a non-Indian occurring on deeded land within the boundaries of the Yakama Reservation. The trial court correctly denied the motion to dismiss for lack of jurisdiction.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

*Sufficiency of the Evidence*

Mr. Zack also contends that the evidence was insufficient to support the conviction, arguing that the victim was a corrections officer rather than a law enforcement officer. We disagree.

Well settled standards govern this challenge. Whether or not sufficient evidence has been produced to support a criminal conviction presents a question of law under the due process clause of the Fourteenth Amendment to the Constitution of the United States. *Jackson v. Virginia*, 443 U.S. 307, 317-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Specifically, *Jackson* stated the test for evidentiary sufficiency under the federal constitution to be "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Washington follows the *Jackson* standard. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980) (plurality opinion); *Id.* at 235 (Utter, C.J., concurring).

A person commits the crime of third degree assault if he, "Assaults a law enforcement officer or other employee of a law enforcement agency who was performing his or her official duties at the time of the assault." RCW 9A.36.031(1)(g). The legislature has not defined the terms "law enforcement officer" or "law enforcement agency" for purposes of this statute; neither are those terms found in the general

11

definition statutes of the criminal code. *See* RCW 9A.04.110.[12] This court has previously determined that the Department of Corrections is a law enforcement agency. *See McLean v. Dep't of Corr.*, 37 Wn. App. 255, 680 P.2d 65 (1984) (construing phrase in felon employment disqualification statute).[13] We think the reasoning of that case is equally applicable here. More importantly, we believe that a fact-finder would contemplate that incarcerating an offender is just as much a law enforcement function as investigating a crime and arresting a suspect. Accordingly, we believe the evidence is sufficient to support the determination that the officer was an employee of a law enforcement agency.

*Cost Issues*

Although he had not complied with our general order, Mr. Zack asks this court not to impose appellate costs against him. Since the State indicates that it will not file a cost bill, we will not further address this request.

---

[12] "Law enforcement officer" is defined in RCW 9A.76.020(2) (Obstructing a law enforcement officer), which states, "'Law enforcement officer' means any general authority, limited authority, or specially commissioned Washington peace officer . . . and other public officers who are responsible for enforcement of fire, building, zoning, and life and safety codes."

[13] Mr. Zack attempts to distinguish *McLean* by pointing to the subsequent enactment of the custodial assault statute, RCW 9A.36.100(1)(b), and suggesting that was the more appropriate charge for this case. However, the assault occurred away from the detention facility, making that statute inapplicable to this case.

No. 34926-8-III
*State v. Zack*


Mr. Zack also challenges the trial court's imposition of $200 incarceration costs without first determining his ability to pay them. The State indicates that it will obtain an order striking that cost award from the judgment and sentence. We remand the case for that purpose.

_____
Korsmo, J.

I CONCUR:

_____
Siddoway, J.

13

# APPENDIX A



**JAY INSLEE**
Governor

**STATE OF WASHINGTON**
## OFFICE OF THE GOVERNOR
*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

## PROCLAMATION BY THE GOVERNOR
### 14-01

**WHEREAS,** on March 19, 2012, Governor Christine Gregoire signed Engrossed Substitute House Bill 2233, "Creating a procedure for the state's retrocession of civil and criminal jurisdiction over Indian tribes and Indian country"; and

**WHEREAS,** Engrossed Substitute House Bill 2233, which became Chapter 48, Laws of 2012, creates a process by which the state of Washington (hereafter, "the State") may retrocede to the United States all or part of the civil and criminal jurisdiction previously acquired by the State over a federally recognized Indian tribe, and the Indian country of such tribe, under federal Public Law 280, Act of August 15, 1953; and

**WHEREAS,** on March 13, 1963, in accordance with federal Public Law 280, Act of August 15, 1953, the State assumed partial civil and criminal jurisdiction, subject to the limitations in RCW 37,12,021 and RCW 37.12.060, within the Indian country of the Confederated Tribes and Bands of the Yakama Nation (hereafter, "Yakama Nation") pursuant to Chapter 36, Laws of 1963; and

**WHEREAS,** after March 13, 1963, the Yakama Nation did not invoke with the State the provision of RCW 37.12.021 but chose to rely upon the rights and remedies of its Treaty of 1855 with the United States, 12 Stat. 951and federal laws; and

**WHEREAS,** on January 11, 1980, the Assistant Secretary-Indian Affairs, United States Department of the Interior, approved the Yakama Nation's petition for re-assumption of jurisdiction over Indian child custody proceedings under the Indian Child Welfare Act of 1978. Effective March 28, 1980, the Yakama Nation reassumed jurisdiction over Yakama Indian child custody proceedings; and

**WHEREAS,** on July 17, 2012, the Yakama Nation filed a retrocession petition with the Office of the Governor. The retrocession petition by the Yakama Nation requests full retrocession of civil and criminal jurisdiction on all of Yakama Nation Indian country and in five areas of RCW 37.12.010, including: Compulsory School Attendance; Public Assistance; Domestic Relations; Juvenile Delinquency; and Operation of Motor Vehicles on Public Streets, Alleys, Roads, and Highways; and

**WHEREAS,** Governor Gregoire convened government-to-government meetings with the Yakama Nation to discuss the Nation's retrocession petition. In the course of those meetings, the Yakama Nation and Governor Gregoire confirmed that the Yakama Nation asks the State to retrocede all jurisdiction assumed pursuant to RCW 37.12.010 in 1963 over the Indian country of the Yakama Nation, both within and without the external boundaries of the Yakama Reservation. However, the Yakama Nation requests that the State retain jurisdiction over mental illness as provided in RCW 37.12.010(4), and jurisdiction over civil commitment of sexually violent predators under RCW 71.09, and acknowledges that the State would retain criminal jurisdiction over non-Indian defendants; and

**WHEREAS,** Governor Jay Inslee convened further government-to-government meetings between the State and Yakama Nation. The Governor's Office has also consulted with elected officials from the jurisdictions proximately located to the Yakama Nation's Indian country; and

**WHEREAS,** on July 9, 2013, Governor Inslee exercised the six-month extension provision for issuing a proclamation, pursuant to RCW 37.12.160; and

**WHEREAS,** strengthening the sovereignty and independence of the federally recognized Indian tribes within Washington State is an important priority for the State; and

**NOW, THEREFORE,** I, Jay Inslee, Governor of the state of Washington, by virtue of the authority vested in me by Section 37.12.160 of the Revised Code of Washington, do hereby grant in part, and deny in part, the retrocession petition submitted by the Confederated Tribes and Bands of the Yakama Nation, according to the following provisions:

1. Within the exterior boundaries of the Yakama Reservation, the State shall retrocede full civil and criminal jurisdiction in the following subject areas of RCW 37.12.010: Compulsory School Attendance; Public Assistance; Domestic Relations; and Juvenile Delinquency.

2. Within the exterior boundaries of the Yakama Reservation, the State shall retrocede, in part, civil and criminal jurisdiction in Operation of Motor Vehicles on Public Streets, Alleys, Roads, and Highways cases in the following manner: Pursuant to RCW 37.12.010(8), the State shall retain jurisdiction over civil causes of action involving non-Indian plaintiffs, non-Indian defendants, and non-Indian victims; the State shall retain jurisdiction over criminal offenses involving non-Indian defendants and non-Indian victims.

3. Within the exterior boundaries of the Yakama Reservation, the State shall retrocede, in part, criminal jurisdiction over all offenses not addressed by Paragraphs 1 and 2. The State retains jurisdiction over criminal offenses involving non-Indian defendants and non-Indian victims.

4. Jurisdiction over Indian child custody proceedings under RCW 37.12.010(3) and Adoption proceedings and Dependent Children pursuant to RCW 37.12.010(6) and (7), which the Yakama Nation reassumed in 1980 under the Indian Child Welfare Act, shall remain under the exclusive jurisdiction of the Yakama Nation.

5. Outside the exterior boundaries of the Yakama Reservation, the State does not retrocede jurisdiction. The State shall retain all jurisdiction it assumed pursuant to RCW 37.12.010 in 1963 over the Yakama Nation's Indian country outside the Yakama Reservation.

6. Nothing herein shall affect the State's civil jurisdiction over the civil commitment of sexually violent predators pursuant to chapter 71.09 RCW and the State must retain such jurisdiction notwithstanding the completion of the retrocession process authorized under RCW 37.12.160.

7. Pursuant to RCW 37.12.010, the State shall retain all jurisdiction not specifically retroceded herein within the Indian country of the Yakama Nation.

8. This Proclamation does not affect, foreclose, or limit the Governor's authority to act on future requests for retrocession under RCW 37.12.160.

Signed and sealed with the official seal of the state of Washington this 17th day of January, A.D. Two-thousand and Fourteen, at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State

# APPENDIX B



**JAY INSLEE**
Governor

**STATE OF WASHINGTON**
Office of the Governor

January 27, 2014

The Honorable Kevin Washburn
Assistant Secretary of Indian Affairs
U.S. Department of Interior
MS-4141 –MIB
1849 C. Street, N.W.
Washington, D.C. 20240

Re:    Yakama Nation Retrocession Petition

Dear Assistant Secretary Washburn:

Pursuant to 25 U.S.C. §1323 and Revised Code of Washington (RCW) 37.12, I have included the attached proclamation, signed by me on January 17, 2014. The proclamation addresses a retrocession petition submitted by the Confederate Tribes and Bands of the Yakama Nation in Washington State.

On March 19, 2012, former Washington State Governor Christine Gregoire signed Engrossed Substitute House Bill 2233. This important piece of legislation created a process by which the state of Washington may retrocede to the United States civil and criminal jurisdiction previously acquired by the State over a federally recognized Indian tribe under federal Public Law 280 in 1953. The bill gives the Governor of the state of Washington the authority to approve, in whole or in part, a retrocession petition submitted by a Washington State Indian tribe. Final approval rests with the U.S. Department of the Interior.

On July 17, 2012, the Yakama Nation filed a retrocession petition with the Office of the Governor requesting full civil and criminal jurisdiction on all of Yakama Nation Indian country in five specific areas of RCW 37.12.010. I believe that the enclosed Proclamation is a great first step towards strengthening the sovereignty and independence of the Yakama Nation.

In paragraph one of the proclamation, the State grants exclusive civil and criminal jurisdiction within the exterior boundaries of the Yakama Reservation in four subject areas of RCW 37.12.010: Compulsory School Attendance; Public Assistance; Domestic Relations; and Juvenile Delinquency.

In paragraph two, the proclamation also grants to the Yakama Nation civil and criminal jurisdiction within the exterior boundaries of the reservation in Operation of Motor Vehicles on Public Streets, Alleys, Roads, and Highways cases which do not involve non-Indian plaintiffs, non-Indian defendants, or non-Indian victims. I would note that the proclamation itself states that the State will retain jurisdiction in these cases over civil causes of action involving "non-Indian



plaintiffs, non-Indian defendants, *and* non-Indian victims," as well as in criminal cases involving "non-Indian defendants *and* non-Indian victims." The intent set forth in paragraph two, however, is for the State to retain jurisdiction in this area where *any* party is non-Indian, and therefore may be more properly read in both instances as the State retaining jurisdiction in those cases involving "non-Indian plaintiffs, non-Indian defendants *and/or* non-Indian victims." I respectfully request that the Department make this clear in the notice accepting the retrocession Proclamation.

Finally, in paragraph three of the proclamation, the State is also retroceding criminal jurisdiction within the exterior boundaries of the reservation over all offenses not specifically addressed in paragraphs one and two, which do not involve non-Indian defendants or non-Indian victims. Again, I would note that in this paragraph the proclamation states that the State retains jurisdiction over criminal offenses involving "non-Indian defendants *and* non-Indian victims," but the intent is for the State to retain such jurisdiction in those cases involving non-Indian defendants *and/or* non-Indian victims."

The proclamation does deny part of the petition by the Yakama Nation, and allow the State to retain existing civil and criminal jurisdiction in a limited number of areas. First and foremost, the State is retaining its existing jurisdiction outside of the exterior boundaries of the Yakama Reservation, including all trust and fee lands. Moreover, consistent with the description above, the State is retaining civil and criminal jurisdiction in Operation of Motor Vehicle cases that involve non-Indian plaintiffs, non-Indian defendants, and/or non-Indian victims.

It is important to note that nothing in the proclamation changes the existing jurisdiction the Yakama Nation has over Indian child custody proceedings under RCW 37.12.010(3) and Adoption proceedings and Dependent Children pursuant to RCW 37.12.010(6) and (7). The Yakama Nation reassumed jurisdiction over these subjects in 1980 under the Indian Child Welfare Act, and shall remain under the exclusive jurisdiction of the Yakama Nation.

Similarly, nothing in the proclamation shall affect the State's civil jurisdiction over the civil commitment of sexually violent predators pursuant to chapter 71.09 RCW and the State must retain such jurisdiction notwithstanding the completion of the retrocession process authorized under RCW 37.12.160.

Thank you for accepting this proclamation on behalf of the state of Washington and for working to bring the retrocession petition to fruition. I look forward to continue working with you and the Yakama Nation on this issue moving forward.

Sincerely,

Jay Inslee
Governor

# APPENDIX C



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

## OCT 19 2015

The Honorable JoDe Goudy
Chairman, Confederated Tribes
    and Bands of the Yakama Nation
P.O. Box 151, Fort Road
Toppenish, Washington 98948

Dear Chairman Goudy:

I am pleased to notify you of our acceptance of retrocession to the United States of partial civil and criminal jurisdiction over the Yakama Nation (Nation).[1] The Department of the Interior (Department) congratulates the State of Washington (State) and the Nation on the careful and deliberative process used to reach agreement on retrocession.[2] We have attempted to be equally deliberative in our process. We explain below the process of our decisionmaking, the reasons for our decision, and the effective date of complete implementation.

It is important to understand what retrocession means. Some correspondence and media reports reflect confusion about the meaning of retrocession. Retrocession does not affect the Nation's formal legal authority or jurisdiction in any way. Indeed, the Nation's authority neither contracts nor expands in light of retrocession. The Nation's jurisdiction simply will no longer be concurrent with the State's; rather, the Nation's jurisdiction will be exclusive for certain purposes. In its retrocession request, the State wishes to give up a portion of the authority that had been delegated to it by Congress under Public Law 280. The sole legal effect of retrocession is to restore Federal authority to the Federal Government over certain categories of offenses within the Yakama Reservation. In short, the primary effect of retrocession is that the State will transfer back to the Federal Government Federal authority that the State had been delegated under Public Law 280. As a result, under retrocession, the State has chosen to retract state authority, Federal authority will resume, and the Nation's authority will remain the same as it has always been.

The road to retrocession has been a long one for the Nation. We commend the State for establishing a formal procedure on retrocession of state criminal and civil jurisdiction to address this issue proactively and thoughtfully. Engrossed Substitute House Bill 2233, enacted in 2012,

---

[1] Jurisdiction was previously acquired by the State of Washington pursuant to Public Law 83-280, 67 Stat. 588, codified as amended at 18 U.S.C. 1162, 28 U.S.C. 1360, and as provided in Revised Code of Washington 37.12.010, 37.12.021, 37.12.030, 37.12.040, and 37.12.060 (1963), and 37.12.050 (1957).

[2] The intended acceptance is pursuant to 25 U.S.C. § 1323 and authority vested in the Secretary of the Interior by Executive Order No. 11435 of November 21, 1968, 33 Fed. Reg. 17339, and delegated to the Assistant Secretary – Indian Affairs. It is also pursuant to the request by the State of Washington reflected in the Proclamation of the Governor 14-01, signed on January 17, 2014, and transmitted to the Assistant Secretary – Indian Affairs in accordance with the process set forth in RCW 37.12.160 (2012).

provided a path for the State and tribal nations to follow in addressing retrocession. After filing the retrocession petition with the Governor in July of 2012, the Nation engaged in government-to-governments meetings with the State. The Nation also entered into a 2013 Memorandum of Understanding with Yakima County regarding the procedures to serve state court arrest warrants on tribal members on trust land within the Yakama Reservation. After following the procedures set forth in House Bill 2233, including a 6-month extension by the State, the Governor submitted the Proclamation for our approval in January of 2014.

From the time the Proclamation was submitted, the Office of Justice Services (OJS) within the Bureau of Indian Affairs (BIA) has engaged with the Yakama Nation Tribal Police Department and Corrections to determine the capacity of the Nation's law enforcement services. In preparation for retrocession, the Nation committed additional resources to their law enforcement services. The Nation has nearly doubled the size of the police department by funding 10 new police officer positions. In September of 2014, OJS finalized an assessment of the Nation's Police Department, which found the Nation has the capacity to respond to an increased number of emergency calls for service and would be prepared to handle increased responsibilities as a result of retrocession.

One of the critical elements of success in preparing for exclusive criminal jurisdiction over some offenses committed by Native Americans is an effective tribal court. In December of 2014, OJS began an assessment of the Yakama Nation Tribal Court. This assessment provided recommendations for improving tribal court operational activities and assisted in developing a strategic 3-5 year plan for the court. On May 6, 2015, OJS issued the tribal court assessment and strategic plan, including findings and recommendations. As a result of these findings, $149,000 in one-time Federal funding was provided to address the following issues: 1) assistance in acquiring necessary equipment, including computers, scanners, and other items, related to the infrastructure of the court; 2) increased salary of law-trained judges; 3) hiring a legal assistant to assist civil pro-se litigants; 4) hiring a court administrator; 5) providing training to tribal judges and tribal prosecutors and defenders on issues involving domestic violence, child abuse, and neglect; and 6) providing relevant training to the court administrator. Discussions have also occurred regarding Fiscal Year 2016 funding for a court management system. Together these efforts will help the Nation further the pursuit of justice and ensure that individuals' rights are protected.

The OJS has also actively engaged in developing partnerships and opening lines of communication between the Nation's police, local law enforcement, county prosecutor's office, the Federal Bureau of Investigation (FBI), and the U.S. Attorney's Office. This has created a more cooperative relationship between law enforcement agencies. As a result, crimes are now less likely to go uninvestigated or unprosecuted.

As is our practice when reviewing retrocession requests, the Department worked closely with the Department of Justice (DOJ) in evaluating the request. In March of 2014, the Department participated in meetings with the DOJ Office of Tribal Justice and the U.S. Attorney's Office in the Eastern District of Washington. On June 16, 2014, the Department formally requested, as set forth in Executive Order No. 11435, the consultation and opinion of the Attorney General with respect to retrocession of criminal jurisdiction. We must work closely with the DOJ in making

this decision because, while the decision is vested with the Department, DOJ has significant equities in light of the additional investigative and prosecution work that is likely to be required of FBI and the United States Attorney's Office in the Eastern District of Washington.

United States Attorney Michael C. Ormsby has been key to our consideration of retrocession. In a letter dated April 3, 2015, to the Acting Deputy Attorney General, the U.S. Attorney expressed caution and stressed the need for careful implementation, but he also noted that the relevant Federal and tribal partners have worked hard in recent years to improve communication and have developed what he described as a "strong, collaborative working relationship[.]" He also noted that the Nation has developed a "symbiotic working relationship with FBI and the USAO" in particular.

The U.S. Attorney vowed to make retrocession successful if it occurs. In his letter, the U.S. Attorney identified with great specificity what needs to happen if retrocession is approved, as well as what has not yet occurred. His guidance has been very helpful. Since law enforcement agencies tend to address matters by priority, it is sometimes difficult to prioritize matters that remain hypothetical. This letter provides the concrete decision that will enable the interested jurisdictions to prioritize plans for implementation.

The U.S. Attorney proposed an implementation period of 6-12 months for law enforcement agencies to develop transition plans. As the chief Federal law enforcement officer in the Eastern District of Washington, his leadership will be crucial in ensuring successful implementation. Accordingly, we have worked his proposal into our decision.

On January 26, 2015, the Department held a formal tribal consultation with the Nation, DOJ, and the United States Attorney's Office to discuss the proposed retrocession. On that occasion, we heard from the Nation the importance of retrocession. We also toured some of the Nation's police training and criminal justice facilities. Since long before statehood for the State of Washington, the Nation and the United States Government have had a government-to-government relationship, evidenced most clearly by the Nation's Treaty with the United States of 1855. The consultation continued that relationship.

During our meetings on the Yakama Reservation, Councilmember Virgil Lewis, who chairs the Tribal Council's Law and Order Committee, advised us of the steps that the Nation has taken to prepare for implementation. He assured us that the Nation has the staff and the employees to undertake law enforcement for the Nation. He was frank and transparent about the opportunities as well as the challenges that retrocession would create. While the Nation's detention center, for example, is a state-of-the-art facility, the tribal court and the police department have certain needs. Following retrocession, the State will no longer have jurisdiction over tribal members as to the offenses for which retrocession has been granted. Thus, the entire responsibility for policing such offenses will rest on the shoulders of the Nation and the United States. As noted above, the Nation's authority has not expanded, but the weight of its responsibility has indeed increased. Accordingly, tribal leadership and the U.S. Attorney, rather than State, county or municipal leadership, will now bear the responsibility and the accountability to tribal members for public safety on the Yakama Reservation. Following our meetings on the reservation, I am confident that the Nation is committed to carrying the weight of this responsibility.

In March of 2015, FBI finalized a report on the implications of retrocession. This report was written at the request of the Office of Tribal Justice. The report concluded that the impact of retrocession was unknown but indicated similarly sized tribes have experienced positive impacts from retrocession. We note that, as a result of retrocession, FBI and U.S. Attorney's Office will undertake the same role that their sister offices play on dozens of reservations throughout the western United States, including Arizona, Montana, New Mexico, and South Dakota.

On April 30, 2015, I met with the Governor's General Counsel to discuss retrocession. An issue that has been highlighted in several meetings is related to reservation boundaries. We have assured anyone who has asked that this process is not a mechanism for redrawing reservation boundaries. The scope of the Yakama Nation's territorial jurisdiction will be governed by Federal law. The decision before my Office is nothing more than an acceptance of the State's request for retrocession. As explained to the Governor's office, this decision is not intended to affect the boundaries of the reservation in any way. As noted above, this decision does not expand tribal jurisdiction; it merely eliminates State authority over certain offenses on the reservation.

The Department also received correspondence from local government representatives about the retrocession request from the State. For example, a letter from Yakima County, signed by Prosecuting Attorney Joseph A. Brusic, Sheriff Brian Winter, and all three County Commissioners, expressed a strong desire to see the retrocession process succeed. They asked for an opportunity to have discussions with the Nation and the Federal Government in an effort to reach agreement on protocols. We will be happy to convene meetings to help facilitate implementation of retrocession. We note, however, that it would constitute extreme hubris for a Federal official more than 2,500 miles away in Washington, D.C., to attempt to resolve disputes between neighbors in the Yakima Valley. That said, the County's request is consistent with the request of the U.S. Attorney and DOJ, and we certainly are willing to create time and space for such discussions.

We appreciate the unanimous expression of support from Yakima County officials. We expect cooperation to be forthcoming. It is our experience that law enforcement officers tend to share a strong esprit de corps and a mutual respect that crosses jurisdictional and even sovereign lines. It comes from the common experience of performing a very difficult job every day as well as a common commitment to protecting the public. Whatever the views of political leadership, when the chips are down and danger is afoot, officers on the beat tend to support one another. We are confident that, police officers working on the ground will be able to develop agreements on mutual aid, cross-deputation, and other needed mechanisms for cooperation. Indeed, in light of increasing fiscal constraints, cooperation in stretching resources is more important than ever. Moreover, in this age of tremendous scrutiny of law enforcement, it is entirely appropriate that police officers arresting Native Americans on the Yakama Reservation be more responsive to tribal officials. It is also appropriate for tribal suspects to answer to tribal institutions, such as tribal courts and tribal juries. This will increase the legitimacy of criminal justice decisions. We hope that this is one of the many positive outcomes of retrocession.

While Congress assigned the decision on retrocession to officials in Washington, DC, it will require careful cooperation between the Nation and the local subdivisions of state government, such as the counties and municipalities, to make it work well.

In early August of 2015, the Department received the DOJ's response to our letter requesting the Attorney General's views on retrocession. The DOJ declined to state a position in favor of or against retrocession. It did, however, recommend that the Department consider a 6-month waiting period between the date of acceptance and actual transfer of jurisdiction in order to allow for an orderly transfer of authority from the State to the Federal Government.

In deference to the counsel of DOJ, a specific period to allow the relevant agencies to coordinate their actions going forward is granted. I am confident that the Nation, working with the U.S. Attorney's Office and BIA OJS can accomplish all of the tasks needed for actual implementation in six months. Accordingly, our decision is that retrocession will be implemented completely as of 12:01 a.m. PST on April 19, 2016.

It is worth noting one final issue has been raised regarding the extent of retrocession. Washington law clearly sets forth the process for retrocession of civil or criminal jurisdiction in Washington State.[3] The process requires the Governor to convene a government-to government meeting, within 90 days of receiving a retrocession resolution, for the purpose of considering the Nation's resolution.[4] Within one year of receipt of the resolution the Governor must issue a proclamation, approving the request either in whole or in part, and formally submit the proclamation to the Federal Government.[5] We understand the Proclamation to be the final product resulting from the formal government-to-government meetings. We also believe that the Proclamation is plain on its face and unambiguous. We worry that unnecessary interpretation might simply cause confusion. If a disagreement develops as to the scope of the retrocession, we are confident that courts will provide a definitive interpretation of the plain language of the Proclamation. In sum, it is the content of the Proclamation that we hereby accept in approving retrocession.

The Nation has long awaited retrocession and will soon take the next step towards greater control over its tribal justice system. While tribal self-governance has long been the Federal Government's guiding principle for Federal Indian policy, it has been slow in coming in the area of criminal justice. Tribal self-governance is more important in this area of public policy and government service than perhaps any other. It would be difficult for this office to reject an agreement reached between the State of Washington and the Yakama Nation, especially one that seeks to facilitate greater tribal self-governance over a matter as important as law enforcement and public safety. We believe that this step will advance tribal self-governance and tribal sovereignty for the Nation. More importantly, we believe that it will produce improved public safety for the Nation and its people.

[3] RCW 37.12.160.
[4] *See* RCW 37.12.160(3).
[5] *See* RCW 37.12.160(4).

If you have questions, please contact Mr. Darren Cruzan, Director, Bureau of Indian Affairs, Office of Justice Services, 1849 C Street, NW, Mailstop 2615, Washington, DC 20240, or by telephone (202) 208-5787.

Sincerely,

Kevin K. Washburn
Assistant Secretary – Indian Affairs

cc: Governor, State of Washington
Director, Office of Tribal Justice, U.S. Department of Justice
United States Attorney, Eastern District of Washington

No. 34926-8-III

FEARING, C.J. (concurring) — I concur in all rulings of the majority, including the majority's reading of the language in paragraph 3 of Governor Jay Inslee's Proclamation 14-01 of January 17, 2014. Sometimes the word "and" means the disjunctive rather than the conjunctive. *Bullseye Distributing LLC v. State Gambling Commission*, 127 Wn. App. 231, 239, 110 P.3d 1162 (2005). In the context of paragraph 3 of the proclamation, we must read the word "and" between "non-Indian defendants" and "non-Indian victims" in the conjunctive because the paragraph declares a partial retrocession. If we read the word "and" in the disjunctive, the proclamation would announce a full retrocession. We must read a document by according all words some meaning. *State v. Roggenkamp*, 153 Wn.2d 614, 624, 106 P.3d 196 (2005).

I disagree with the majority's utilization of Governor Jay Inslee's January 27, 2014, letter to the United States Department of the Interior to assist in discerning the intent of Proclamation 14-01. The Department of the Interior did not deem the Governor's letter as binding on the department. We determine the measure of retrocession by the extent of acceptance by the Department of the Interior, not the intent of the State to the extent the State expresses that intent in a document not accepted by the department. *United States v. Lawrence*, 595 F.2d 1149, 1151 (9th Cir. 1979); *Oliphant v.*

No. 34926-8-III
*State v. Zack—concurring*

*Schlie*, 544 F.2d 1007 (9th Cir. 1976), *rev'd on other grounds sub nom. Oliphant v.*

*Suquamish Indian Tribe*, 435 U.S. 191, 98 S. Ct. 1011, 55 L. Ed. 2d 209 (1978); *Omaha*

*Tribe of Nebraska v. Village of Walthill*, 334 F. Supp. 823 (D. Neb. 1971), *aff'd sub nom.*

*Omaha Tribe of Nebraska v. Villlage of Walthill, Nebraska*, 460 F.2d 1327 (8th Cir.

1972).

I CONCUR:

_____
Fearing, C.J.

2